**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ANTWINNETTE ELLIOTT-DISKIN**,

      Plaintiff,

    vs.                           No. CIV-06-0074 MCA/WDS

**UNUM/PROVIDENT INSURANCE**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion for Judgment on Administrative (ERISA) Record* [Doc. 18], filed October 31, 2006; *Plaintiff's Motion to Reverse ERISA Benefits Denial* [Doc. 21], also filed October 31, 2006; and Plaintiff's *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision* [Doc. 27], filed June 29, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies Defendant's motion; denies Plaintiff's motion to reverse; remands the matter for the limited purpose explained herein; and denies Plaintiff's motion to supplement the record.

## I. BACKGROUND

### The History

Plaintiff Antwinnette Elliott-Diskin was employed by Team One Advertising/Saatchi & Saatchi ("Team One") in California as an Audio-Visual Supervisor/Off-Line Editor from

August 1989 until April 1997.  On October 16, 1997, she applied for long-term disability

benefits, claiming a chemical imbalance and a malfunctioning thyroid.  Her treating

physician diagnosed her with major depression and tension headaches.  [See PRLCL 00034-

00039].[1]  On March 17, 1998, Ms. Elliott-Diskin's application was approved under the

"Other Limitations" provision of her policy.  [PRLCL 00116-00117].  That provision states:

> For any disability that is caused or contributed to by a Mental
> Disorder or Substance Use Disorder, benefits are payable for up
> to twenty-four months whether or not the Employee is Hospital
> Confined.  After twenty-four months, subject to all other policy
> provisions, We pay benefits only if an Employee is Hospital
> Confined due to the Disability, and for up to three months after
> the date the Employee is no longer confined.

[Elliottpol 00032].  Accordingly, Ms. Elliott-Diskin was eligible to receive benefits until

October 13, 1999.  [PRLCL 00116].

On August 18, 1999, UNUM/Provident sent Ms. Elliott-Diskin a letter informing her

that her maximum benefit period was going to end on October 12, 1999.  With the letter,

UNUM/Provident paid Ms. Elliott-Diskin's remaining disability benefits in advance and

advised her that her claim had been closed.  [PRLCL 00223].

In a letter dated November 16, 1999, Ms. Elliott-Diskin requested an extension of time

in which to file an appeal, explaining that she "was in the process of seeking the diagnosis

of Dr. Richard Harris, a specialist in the area of pain management and Chronic Fatigue

Immune Deficiency Syndrome ("CFIDS"), when it became necessary for [her] to move

---

[1]  The parties' *Stipulated Notice of Filing the Administrative Record* [Doc. 24] provides
the key to and explains the record citations used herein.

[from California to Oregon]." [PRLCL 00221]. Ms. Elliott-Diskin explained that she had also sought care from Dr. Kip Kemple, a specialist in rheumatology and CFIDS. [PRLCL 00221]. Ms. Elliott-Diskin included with her request a copy of Dr. Harris's records. Those records note that Ms. Elliott-Diskin was seen for an initial pain consultation on August 9, 1999, at which time she "c[ame] in with a chief complaint of fatigue and chronic pain in the back of her knees, elbows, fingers, neck and low back." [PRLCL 00227]. Dr. Harris's records also note that Ms. Elliott-Diskin complained of (1) knee and low-back pain; (2) fogginess, anxiety, and mood swings; (3) significant depression; and (4) a significant sleep disorder. [PRLCL 00227]. Dr. Harris diagnosed Ms. Elliott-Diskin with fibromyalgia with overlying myofascial pain syndrome. [PRLCL 00226].

In a letter dated December 7, 1999, UNUM/Provident confirmed receipt of Ms. Elliott-Diskin's November 16, 1999 extension request and advised the following:

> Since you have now taken the position that your disability is due to a medical condition, we would recommend that you submit copies of all office notes, records, test results and diagnostic studies from the treating sources who are certifying that your conditions are of totally disabling proportions.

[PRLCL 00234]. Ms. Elliott-Diskin's policy contains the following definition of "total disability" or "totally disabled":

> TOTAL DISABILITY or TOTALLY DISABLED FROM THE EMPLOYEE'S OWN OCCUPATION means that during the Elimination Period and until he reaches the end of his Maximum Benefit Period, the Employee:
>
> > 1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of

> an Injury or Sickness that started while insured under this
> Policy; and
> 2. does not work at all; and
> 3. is under Doctor's Care.

[ELLIOTTpol 00014].

On March 20, 2000, Ms. Elliott-Diskin forwarded to UNUM/Provident a copy of Dr. Kemple's notes. Dr. Kemple diagnosed Ms. Elliott-Diskin with, among other things, chronic fatigue and chronic myalgia-arthralgia syndrome, compatible with fibromyalgia/chronic myofascial pain. [PRLCL 00529]. Dr. Kemple also diagnosed depression with associated anxiety/panic attacks and cognitive difficulty. [PRLCL 00528]. He explained that while "[c]hronic fatigue syndrome is a debilitating condition with medical and neurophysiologic components [and d]epression and anxiety are common in this setting . . . psychiatric diagnoses are not likely contributing significantly to work impairment or functional problems in Ms. Elliottt's [sic] case nor most patients with this syndrome." [PRLCL 00527].

Having received the opinions of Drs. Harris and Kemple, UNUM/Provident next sought a medical review by one of its in-house physicians. On April 4, 2000, Dr. Paul Martin commented on Ms. Elliott-Diskin's case:

> Changing the diagnosis here appears to be tantamount to changing horses mid-stream. It also appears that depending in whose waiting room you sit determines what diagnosis you get.
>
> There is very little mention back in 96-97 about widespread pains and fatigue as prime complaints and no mention about her new diagnoses. She may indeed now present with multiple trigger points and the required number of tender points to satisfy the classification criteria for FMS but these points are subjective findings and easily learned.

4

> We need further psych review here.  One cannot help have a high titer of suspicion when an insured changes from a psych diagnosis to a medical one such as CFS and or FMS when her insurance coverage is about to end.  She still appears with her psych problems to this medical person plus as one with a great deal of somatization carrying several functional somatic symndromes [sic].

> I would suggest a field review of insured as well as surveillance.

[PRLCL 00242].  UNUM/Provident continued to pay benefits to Ms. Elliott-Diskin with a reservation of rights while it further reviewed her claim.  [PRLCL 00248].

The record reveals that between May 25, 2000 and February 11, 2002, UNUM/Provident received a number of *Attending Physician's Statements* signed by Dr. Kemple, in which Dr. Kemple opined that Ms. Elliott-Diskin was totally disabled with respect to both her job and any other work. [See, e.g., PRLCL 00249, 00265, 00276, 00281, 00290, 00293, 00296, 00299, 00303, 00306, 00310].  Yet on September 28, 2000, UNUM/Provident agent Donald Pooler completed a field report following an interview with Ms. Elliott-Diskin at her California home.  During that interview, Ms. Elliott-Diskin told Mr. Pooler that she spent most of her days in bed because she was "too exhausted to do much." [PRLCL 00268].  However, Mr. Pooler noted in his report that he actually had to schedule his interview with Ms. Elliott-Diskin because two earlier attempts to meet with her unannounced were unsuccessful, as Ms. Elliott-Diskin was not at home on those occasions. [PRLCL 00267-00271]. Under the section of his report titled "Future Plans," Mr. Pooler stated that "[i]t is interesting to note that [Ms. Elliott-Diskin] will be moving next week to Santa Fe, New Mexico to assist her mother who apparently is ill.  This is incongruent with

her statements of not being able to partake in various physical activities at home." [PRLCL 00268]. On September 10, 2002, UNUM/Provident informed Ms. Elliott-Diskin that her claim was approved, [PRLCL 00313], but an *Action Plan/Log* created on May 16, 2003 recommended a clinical update and review and specifically noted that Ms. Elliott-Diskin's claim to Mr. Pooler that she spent most of her time asleep in bed was inconsistent with the fact that she was not home on the two occasions he tried to meet with her unannounced. [PRLCL 00325].

On September 11, 2003, Dr. J. William Wellborn conducted an independent medical evaluation ("IME") of Ms. Elliott-Diskin.[2]   [PRLCL 00648-00654]. Dr. Wellborn is a Diplomate of the American Board of Physical Medicine and Rehabilitation who earned his medical degree from the University of New Mexico School of Medicine in 1983. From 1983 to 1986, he served as Chief Resident in Physical Medicine and Rehabilitation at the University of Texas Health Science Center at San Antonio. Dr. Wellborn is, among other things, a Board Certified Independent Medical Examiner. He also is board certified by the American Academy of Pain Management. As part of his medical practice, he performs disability evaluations. Dr. Wellborn is in private practice in Physical Medicine and Rehabilitation and is on staff at HealthSouth Rehabilitation Center and at Presbyterian and

---

[2]   Also on September 11, 2003, the surveillance suggested by Dr. Martin was conducted and a surveillance CD, included in the Administrative Record as Exhibit A-5, was created. The Court has reviewed this CD, which shows Ms. Elliott-Diskin walking out of Dr. Wellborn's office building and entering an SUV and, other than having the door to the vehicle opened for her, doing so unassisted. The SUV is then seen driving to a fast-food restaurant. A detailed narrative of what the investigator observed during the surveillance also is included in the record. [See PRLCL 00388-00393].

St. Joseph's Hospitals in Albuquerque, New Mexico. Dr. Wellborn is licensed to practice medicine in New Mexico and Texas. [PRLCL 00640-00641].

As part of his IME, Dr. Wellborn reviewed medical records from Drs. Kemple and Harris, an "operative report" from Ricardo E. Huete, M.D., and a pathology report. [PRLCL 00651]. Dr. Wellborn also conducted a physical examination of Ms. Elliott-Diskin, who told him that she had been diagnosed with fibromyalgia. Ms. Elliott-Diskin advised Dr. Wellborn that fatigue following surgery in 1997 eventually turned so prominent that she became unable to work. Ms. Elliott-Diskin complained of pain, numbness, weakness, troubled sleep, deteriorating eyesight, and problems with memory and concentration. [PRLCL 00652-00654]. Although she stated that she was "able to do all of her activities of daily living," such as driving short distances; doing some shopping; and handling such household tasks as loading the dishwasher, making the bed, and dusting, Ms. Elliott-Diskin told Dr. Wellborn that these activities left her "very fatigued." [PRLCL 00652]. Ms. Elliott-Diskin told Dr. Wellborn that she had worked for Team One for nine years and loved her job; however, she felt unable "to handle the cognitive requirements of her position." [PRLCL 00651]. According to Ms. Elliott-Diskin, the heaviest thing she handled at Team One was a ten-pound camera, which she usually used twice a year. [PRLCL 00651].

On the basis of the medical records he reviewed, as well as his own examination of her, Dr. Wellborn concluded that Ms. Elliott-Diskin was suffering from fibromyalgia. [PRLCL 00648]. Nevertheless, Dr. Wellborn determined that Ms. Elliott-Diskin could return to work "if she wished to." [PRLCL 00648]. Dr. Wellborn, who expressly stated that he did

7

not doubt Ms. Elliott-Diskin's complaints of pain and fatigue, noted that she nonetheless had full range of motion of the neck, shoulders, fingers, wrists, elbows, and hips, as well as full strength in all muscle groups of the upper and lower extremities.  [PRLCL 00649-00650].  Dr. Wellborn also noted that Ms. Elliott-Diskin would not shake his hand because she claimed that her right arm was bothering her.  For that reason, she held her hand "limply by her side."  [PRLCL 00650].  During the actual physical examination, however, "[Ms. Elliott-Diskin] demonstrated . . . no difficulty moving or using her right arm . . . ."  [PRLCL 00650].

Dr. Wellborn's written report states that

> Ms. Diskin gives a history of severe and chronic pain going back many years with a report of being unable to work since 1998. She attributes her current problems to fibromyalgia. She had previously been given a diagnosis of chronic fatigue syndrome which she believes led to fibromyalgia. She understands this to be her current diagnosis. Fibromyalgia is a condition of chronic, widespread pain lasting greater than six months accompanied by tenderness of at least 11 of 18 tender points when palpated with 4 kg of digital (finger) pressure. This is a condition which lends itself to "self-diagnosis" since individuals need only to give a report of widespread pain lasting greater than six months. In addition, they need to respond with digital pressure that 11 of 18 points are "painful." There are no objective physical examination or definitive diagnostic studies associated with this condition.  It can be accompanied by concomitant depression and anxiety, though that does not appear to be the case in Ms. Diskin's case at this time.  Unfortunately many individuals  become comfortable assuming the sick role, especially when accompanied by secondary gain such as disability payments. Though I believe Ms. Diskin's complaints of fatigue and pain are to be believed, it is my opinion that she could work if she wished to.  Many, many patients who have severe and objective evidence of disease and injury are willing and able to continue working, perhaps with limitations, but nevertheless are able to do so.  Disability is frequently a matter

of choice and lifestyle and this is probably the case with Ms. Diskin. It is my opinion that she is certainly quite deconditioned at this time but, if she wished to, she could gradually get herself into better physical condition to enable her to return to the workforce full time at a light-work category lifting no more than 10-20 pounds on an infrequent basis. A gradual return to work on a part-time basis, perhaps three to four hours per day for four to eight weeks and eventually to full time, would be appropriate and would allow her, from a physical standpoint, to return to work. ***The cause of her reported cognitive and memory complaints is not clear and certainly was not apparent during today's evaluation. I do believe though, that these complaints should be more thoroughly evaluated and best evaluated by neuropsychological testing by a competent and respected neuropsychologist. My evaluation today focused on the physical aspects of her complaints, and I feel a more-detailed evaluation by a neuropsychologist would be appropriate. In addition, it is my opinion that an MRI scan of the brain and cervical spine would also be indicated for further evaluation of her bodily and cognitive complaints. Should these diagnostic imaging tests be normal, I would find no barriers to Ms. Diskin returning to work from a physical standpoint, other than her willingness to do so.***

[PRLCL 00648-00649 (emphasis added)]. A *Patient Questionnaire* that Ms. Elliott-Diskin completed after the conclusion of the IME indicates that she was "pleased with the manner in which this evaluation was performed." [PRLCL 00422].

In a *Clinical Review Request* dated December 18, 2003, UNUM/Provident posed the following question to in-house physician Tanya Horne, M.D.:

Do you agree with the opinion of the IME dated 9/11/03? If you do not agree with the opinion the IME provides, please provide additional comments if necessary.

[PRLCL 00467]. Dr. Horne's response indicates that she reviewed, among other documents, (1) Dr. Wellborn's IME; (2) in-house physician Dr. Paul Martin's April 4, 2000 medical

9

report; (3) a *Vocational Rehabilitation Assessment of Work Capacity* prepared by Senior Vocational Rehabilitation Consultant Catherine Rogers[3]; and (4) medical records of Joshua Brown, M.D., who treated Ms. Elliott-Diskin between March 2003 and October 2003.[4] Based on her review, Dr. Horne stated that she "agreed with the opinions expressed by Dr. Wellborn in his IME report dated 9/11/03. *There are no physical barriers to prevent the insured from RTW from a physical standpoint*." [PRLCL 00464 (emphasis added)]. While Dr. Horne noted "reported tenderness to palpation areas associated with fibromyalgia and control points as well[,]" she nevertheless concluded that "[p]hysical exam findings were essentially normal[.]" [PRLCL 00465]. As did Dr. Wellborn, Dr. Horne suggested that Ms. Elliot-Diskin's cognitive issues be addressed. [PRLCL 00464].

By letter dated January 20, 2004, UNUM/Provident informed Ms. Elliott-Diskin that because she did not meet the definition of "disabled" as that term was used in her policy; no further benefits were payable and her file had been closed. [PRLCL 00471]. UNUM/Provident's determination was based on a consideration of the results of Dr. Wellborn's IME and all of Dr. Brown's medical records, all of which were reviewed by

---

[3] Catherine Rogers was asked the following question: "Based on the insured's report and the information in the file can insured perform her own occupation[?]" [PRLCL 00460]. Because Team One refused to perform a requested job analysis, Ms. Rogers contacted Genex Services, Inc., which prepared a representative job analysis for her. [PRLCL 00455-00457]. Among other things, the Genex document indicates that the position of Audio-Visual Supervisor requires the occasional (1%-33% of the time) lifting of objects weighing up to 24 pounds, and no lifting of objects weighing between 25 and 100 pounds. [PRLCL 00456].

[4] Dr. Brown's records indicate that Ms. Elliott-Diskin complained of anxiety, insomnia, depression, chronic fatigue, and shoulder pain, and that he diagnosed her with fibromyalgia. [PRLCL 00442-00448].

UNUM/Provident's in-house medical reviewer, as well as Catherine Rogers's vocational assessment.   [PRLCL 00469-00470].   While UNUM/Provident did not question the fibromyalgia diagnosis, it explained that its medical reviewer agreed with Dr. Wellborn's conclusion that Ms. Elliott-Diskin could, if she wished to, return to her former position as she had described it.   UNUM/Provident twice noted in its letter its medical reviewer's agreement with Dr. Wellborn's suggestion that Ms. Elliott-Diskin's cognitive and memory complaints be evaluated by a neuropsychologist; importantly, however, UNUM/Provident reminded Ms. Elliott-Diskin that maximum benefits had already been paid under the "Mental and Nervous Provision" of her policy.[5]   [PRLCL 00469-00470].   In closing, UNUM/Provident outlined its appeals process, explaining that any written appeal was due within 90 days and "should include [Ms. Elliott-Diskin's] comments and views of the issues, as well as any new documentation [she] wish[ed UNUM/Provident] to consider."   [PRLCL 00469].

Ms. Elliott-Diskin appealed UNUM/Provident's January 20, 2004 determination by letter dated March 23, 2004.   In her letter, Ms. Elliott-Diskin complained about what she believed to be Dr. Wellborn's failure to address (1) her sleep disorder; (2) the fact that she suffered from chronic fatigue so severe that she was bedridden for one or two days each week; (3) the fact that getting out of bed each day was a challenge; and (4) that her cognitive issues were not psychological but, rather, a result of the toll fibromyalgia had taken on her

---

[5] Specifically, UNUM/Provident stated that "[i]t should be noted that no further psychological evaluations were performed regarding your reported cognitive condition.  Our records reflect that benefits were paid to the Maximum Benefit Period allowed under the Mental and Nervous Provision of your claim." [PRLCL 00469].

central nervous system.[6]  [PRLCL 00481].  With respect to those cognitive issues, Ms. Elliott-Diskin explained that while she had not seen a psychiatrist or psychologist for a number of years, she was pursuing hypnotherapy "as an alternative form of therapy" and had found it to be "extremely beneficial." [PRLCL 00481].  Other than Ms. Elliott-Diskin's claim about the benefits of hypnotherapy, however, there was no actual documentation or other medical evidence submitted with her appeal to explain the impact that hypnotherapy was having on her fibromyalgia, or the restrictions and limitations she continued to experience notwithstanding hypnotherapy.  Summing up, Ms. Elliott-Diskin explained that

> though extreme body aches ma[d]e it difficult for [her] to move, sit for even a short period of time, or use [her] hands for typing, it [was] the bed ridding **chronic fatigue, short term memory loss and brain fog** that disable[d her] from working, even on a part-time basis.  <u>These disabling ailments have not been addressed by UnumProvident.</u>

[PRLCL 00481] (emphasis in original).

UNUM/Provident responded to Ms. Elliott-Diskin's letter of appeal by letter dated April 6, 2004. In that letter, UNUM/Provident explained that Ms. Elliott-Diskin's failure to "submit any additional medical records in support of [her] claim, or submit from [her] medical providers clinically supported restrictions and limitations that [were] a result of fibromyalgia, a sleep disorder, neuro-cognitive deficits, or impairments due to medication usage[]" prevented UNUM/Provident from reconsidering its determination of January 20,

---

[6] Interestingly, however, Ms. Elliott-Diskin indicated on a *Patient Questionnaire* her satisfaction with the manner in which the IME was conducted.  [See PRLCL 00422 ("Were you pleased with the manner in which this evaluation was performed? Yes[.]")].

2004. [PRLCL 00488-00499].   UNUM/Provident therefore upheld the January 20, 2004

determination, but advised Ms. Elliott-Diskin that

> if you have additional medical information that is based on
> clinical findings that would support an inability to perform the
> important duties of your occupation as it is defined by the policy
> since our benefits terminated, please submit this information
> . . . . This information can be in the form of office notes, testing,
> and/or consultations.  Certifications of disability and/or specific
> restrictions and limitations need to be accompanied by the
> clinical findings that support them.

[PRLCL 00488].

On May 11, 2004, Ms. Elliott-Diskin filed her second letter of appeal.  With this letter,

Ms. Eliott-Diskin included an April 22, 2004 letter from Dr. Brown, explaining that she was

(1) suffering from chronic fatigue syndrome, fibromyalgia, insomnia, and anxiety;

(2) "significantly debilitated on and off by her condition"; and (3) unable to hold any full-

or part-time job requiring specific hours.  Still, Dr. Brown noted that Ms. Elliott-Diskin had

"no specific work instructions other than she must not be forced to work at times when she

is feeling her symptoms."  [PRLCL 00531].

Ms. Elliott-Diskin also included notes from Dr. Kemple, taken February 23, 2000,

indicating chronic fatigue syndrome as "the most appropriate working diagnosis" at that

time, [PRLCL 00527-00529], as well as August 9, 1999 notes from Dr. Harris, expressing

his belief that Ms. Elliott-Diskin suffered from fibromyalgia with overlying myofascial pain

syndrome. [PRLCL 00524-00526].  Additionally, Ms. Elliott-Diskin included (1) records of

a 1997 CT scan; (2) assorted medical records from the years 1996, 1997, and 1998; and

(3) an article titled *Chronic Fatigue Syndrome and Fibromyalgia: Clinical Assessment and Treatment*. [PRLCL 00490-00523].

After having successfully requested an extension of time, Ms. Elliott-Diskin submitted additional doctors' notes and questionnaires. An October 7, 2004 note from Dr. Brown states that

> currently, [Ms. Elliott-Diskin] still suffers from severe fatigue, insomnia, muscle pain, and is quite debilitated by these symptoms. It should be noted that there are established criteria for diagnosing fibromyalgia, and she has met those criteria, both by my exam and by previous practitioners.
>
> I do not feel, given her current state and condition, that she could work in the type of environment that she has described to me . . . .

[PRLCL 00678]. The work environment as described to Dr. Brown, however, included "a physical component of . . . setting up lighting and equipment, sometimes weighing as much as 75 pounds . . . ." [PRLCL 00678]. But during her IME with Dr. Wellborn, Ms. Elliott-Diskin described a different work environment, explaining that the heaviest thing she handled at Team One was a ten-pound camera, which she usually used only twice a year. [PRLCL 00651].

In response to a *Long Term Disability Questionnaire* asking the following: "Do you have an opinion as to whether Antwinnette Elliott-Diskin can perform her former work as audio/visual supervisor, off-line editor on a regular sustained basis[?]" Dr. Brown checked the space next to "No, she cannot perform her former work" [PRLCL 00677]. He did not, however, elaborate in the space provided on the reasons he believed Ms. Elliott-Diskin was

14

unable to work on a regular basis.  Dr. Leroy Pacheco, who examined Ms. Elliott-Diskin in the summer and autumn of 2004, was more detailed on his questionnaire, opining that fibromyalgia prevented Ms. Elliott-Diskin from working in her former position and listing as the factors limiting her ability to work on a sustained basis issues with short-term memory, decision-making, organizational skills, and other cognitive concerns.  Additional notes written by Dr. Pacheco in July, August, and October 2004, as well as a statement from Ms. Elliot-Diskin's husband, were also made part of her second letter of appeal. [PRLCL 00671-00675].

In its *Final Administrative Decision* ("FAD") of October 22, 2004, UNUM/Provident upheld its earlier denial of Ms. Elliott-Diskin's claim. [PRLCL 000689].  UNUM/Provident again quoted the definition of "total disability" from Ms. Elliott-Diskin's policy and noted that "[w]ith her appeal, [Ms. Elliott-Diskin] did not submit any additional medical records in support of her claim, or submit from her medical providers clinically supported restrictions and limitations that were a result of her medical conditions of fibromyalgia, a sleep disorder, neuro-cognitive deficits, or impairment due to medication usage." [PRLCL 00688].  UNUM/Provident stressed the *absence* of information, noting that, aside from documented decreased right-arm and right-shoulder strength and a shoulder impingement (which impingement should not have been permanent), "[t]he remainder of [Ms. Elliott-Diskin's] complaints and severity of such continued to be of a self reported nature [and that its] clinician concluded that the degree of impairment was not illustrated in the provided records." [PRLCL 00688].

UNUM/Provident went on to explain that its Internal Medicine board-certified medical consultant, Valencia Clay, M.D., had assessed Ms. Elliott-Diskin's functionality and concluded, with a reasonable degree of medical certainty, "that there was no evidence of total impairment except by way of Ms. Elliott[-]Diskin's self-report." [PRLCL 00688]. Dr. Clay further noted that Dr. Brown's conclusions also were based on Ms. Elliott-Diskin's self-reporting, inasmuch as he had opined that she should not work at times she felt her symptoms. UNUM/Provident emphasized that "cognitive dysfunction was not supported, as no cognitive abnormality had been documented during office visits, and no formal neuropsychological testing had been submitted." [PRLCL 00688]. Additionally, UNUM/Provident explained that Dr. Wellborn had found no *physical* abnormality that would have caused a total loss of functional capacity. [PRLCL 00688].

With respect to the latest medical information Ms. Elliot-Diskin had submitted, particularly that included as Dr. Pacheco's answers to the *Long Term Disability Questionnaire*, Dr. Clay stated that

> [w]ith a reasonable degree of medical certainty, the newly submitted information does not change the previous opinion. Total impairment from sedentary to light work is not supported. Impairment is based solely on Mrs. Elliott-Diskin's report of symptoms and reduced ability to function.
>
> Mrs. Elliott-Diskin consistently reports pain and loss of functional capacity and there is no documentation of activity that is significantly inconsistent with her reports of symptoms and impairment.
>
> However, there are no objective findings that support the intensity and persistence of the reported symptoms and

impairment.

> ***Cognitive dysfunction is reported as being a major cause of impairment. Yet, no formal, objective evaluation such as neuro psychiatric testing or even a mini mental status examination has been documented to assess her actual cognitive function.***
>
> ***The physicians are basing their determination of impairment on Mrs. Elliott-Diskin's self-report of cognitive abnormalities and impairment***.
>
> Treatment for fibromyalgia has not been optimal, lacking cognitive behavioral therapy and other evaluation and treatment to address the reported psychological issue of anxiety.

[PRLCL 00686-00687 (emphasis added)].  In conclusion, UNUM/Provident maintained that the denial of Ms. Elliott-Diskin's claim was appropriate, as clinically supported restrictions and limitations could not be established from the medical data before it. [PRLCL 00686].

## The Appeal

On January 25, 2006, Ms. Elliott-Diskin brought suit against UNUM/Provident pursuant to the Employment Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.* ("ERISA"), alleging, *inter alia*, that UNUM/Provident has breached its fiduciary duty by failing to pay her the full benefits she is owed.[7] [See generally Doc. 1].  On October 31, 2006, Ms. Elliott-Diskin moved for the reversal of the denial of benefits, arguing, in part, that

> [i]n working to defeat [her] claim, Defendant essentially considered only that part of [her] job description dealing with exertional requirements of her job.  Ultimately, Defendant cut

---

[7] Ms. Elliott-Diskin also has asserted a state-law claim for unfair trade practices. [Doc. 1 at unnumbered 3-4].

off benefits on the basis of an IME medical review, and a vocational assessment that failed to consider [Ms. Eliott-Diskin's] non-exertional limitations in a job that involved mental and intellectual tasks.

[Doc. 22 at 2]. She also contends that Dr. Wellborn's opinions are inconsistent with her complaints and the medical evidence and that Dr. Wellborn did not even consider the mental and intellectual demands of her former position when evaluating her disability. [Id. at 14-16]. Finally, Ms. Elliott-Diskin maintains that because her treating physicians had a better understanding of her condition, their opinions should be given more weight than that of Dr. Wellborn. [Id. at 16-17] .

In its response, as well as in *Defendant's Memorandum in Support of Motion for Judgment on the Administrative (ERISA) Record*, UNUM/Provident contends that it has demonstrated that its denial of Ms. Elliott-Diskin's request for long-term disability benefits was reasonable because (1) a qualified and objective physician (Dr. Wellborn) thoroughly examined her and, having accepted that she suffered from fibromyalgia, nevertheless concluded from his IME that fibromyalgia did not render Ms. Elliott-Diskin totally disabled; (2) three other in-house physicians (Drs. Martin, Horne, and Clay) reviewed Ms. Elliott-Diskin's file and concurred in Dr. Wellborn's determination that she was not totally disabled; (3) Ms. Elliott-Diskin did not comply with UNUM/Provident's requests to provide objective evidence of her restrictions and limitations, particularly those related to her cognitive complaints; and (4) under the circumstances, the opinions of Ms. Elliott-Diskin's treating physicians were entitled to no greater weight than the opinion of Dr. Wellborn. [See

generally Docs. 18, 19, 22, 26].

## II. ANALYSIS

### A. Standard of Review

Section 1132 of ERISA provides, in pertinent part, that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B).  The denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed de novo unless the applicable plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Where the plan gives the administrator such discretion, the Court applies an arbitrary and capricious standard of review,  Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998), and "'review is limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith.'"  Fought v. Unum Life Ins. Co. Of Am., 379 F.3d 997, 1003 (10th Cir. 2004) (quoting Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir.2002)).  In this case, it is undisputed that the plan gives UNUM/Provident discretionary authority to determine eligibility for benefits and to construe the terms of the plan.  Accordingly, in considering whether UNUM/Provident's decision was arbitrary and capricious, the Court considers only the arguments and evidence before it at the time it made that decision and asks whether (1) substantial evidence supported UNUM/Provident's decision; (2) UNUM/Provident based its decision on a mistake of law;

and (3) UNUM/Provident conducted its review in bad faith or under a conflict of interest. Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 379 F.3d 1168, 1176 (10th Cir. 2004).

Because UNUM/Provident acts both as insurer and plan administrator, it operates under an inherent conflict of interest. [See Doc. 18 at 10; Doc. 22 at 13]. "More specifically, because it is both the insurer and plan administrator, [UNUM/Provident] 'may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries.'" DeGrado v. Jefferson Pilot Fin. Ins. Co., 451 F.3d 1161, 1167 (10th Cir. 2006) (*quoting* Fought, 379 F.3d at 1003). When there exists such a conflict of interest, the Court undertakes a "sliding scale" analysis, where the degree of deference accorded the plan administrator is inversely related to the seriousness of the conflict. Id. at 1167-68 (internal quotations omitted). "Where, as here, an inherent conflict of interest exists, 'the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.'" Id. at 1168 (*quoting* Fought, 379 F.3d at 1006). The Court, in turn, is "obligated to 'take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.'" Id. (*quoting* Fought, 379 F.3d at 1006). Importantly, UNUM/Provident's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious [and] will be upheld unless it is not grounded on any reasonable

20

basis." Finley, 379 F.3d at 1176.

### B. *Defendant's Motion for Judgment on Administrative (ERISA) Record* and *Plaintiff's Motion to Reverse ERISA Benefits Denial*

Fibromyalgia is defined by *The Merck Manual* as "'[a] group of common nonarticular disorders characterized by achy pain, tenderness and stiffness of muscles, areas of tendon insertions and adjacent soft-tissue structures.'" Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 627 n.1 (10th Cir. 2003) (*quoting* THE MERCK MANUAL 481 (17th ed.1999)). A diagnosis of fibromyalgia cannot be confirmed through medical tests, since the condition manifests itself only through clinical symptoms. Dorsey v. Provident Life and Acc. Ins. Co., 167 F.Supp.2d 846, 855 (E.D.Pa. 2001). "'Because proving the disease is difficult . . . , fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'" Welch v. Unum Life Ins. Co. Of Am., 382 F.3d 1078, 1087 (10th Cir. 2004) (*quoting* Walker v. Am. Home Shield Long Term Disability Plan, 180 F.3d 1065, 1067 (9th Cir.1999)).

To be sure, fibromyalgia's cause or causes are unknown, there is no cure, and symptoms are entirely subjective. Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004). Still, "'[w]hile the diagnos[i]s of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of [the] illness[] do lend themselves to objective analysis.'" Welch, 382 F.3d at 1087 (*quoting* Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16 n. 5 (1st Cir.2003)). In the instant case, it is not disputed that at the relevant times Ms. Elliott-Diskin suffered from fibromyalgia. The pertinent question is whether UNUM/Provident had a reasonable

basis for concluding that fibromyalgia did not render Ms. Elliott-Diskin "totally disabled," as that term is defined by her insurance policy.  See Finley, 379 F.3d at 1176 (plan administrator's conclusion need not be the most logical or even the best one, so long as it is grounded on a reasonable basis).

The Administrative Record in this case reveals that Ms. Elliott-Diskin first notified UNUM/Provident that she was seeking care from specialists in CFIDS (Drs. Harris and Kemple) in late 1999, after UNUM/Provident had informed her that the long-term disability benefits she had been receiving under the "Other Limitations" provision of her policy were nearing an end.  Dr. Harris diagnosed Ms. Elliott-Diskin with fibromyalgia with overlying myofascial pain syndrome.  Dr. Kemple saw Ms. Elliott-Diskin on a number of occasions over the course of several years,[8] and his notes indicate his consistent belief that Ms. Elliott-Diskin was totally disabled from her own job and from any other work.  [PRLCL 00249, 00265, 00276, 00281, 00290, 00293, 00296, 00299, 00303; 00306, 00310].

On September 11, 2003, Dr. Wellborn conducted his IME of Ms. Elliott-Diskin.  The report he prepared subsequent to the IME reflects that Dr. Wellborn reviewed, among other documents, Dr. Kemple's records and Dr. Harris's records.  Dr. Wellborn also conducted a physical examination of Ms. Elliott-Diskin, during which he noted full range of motion of the neck, the shoulders, and the hips in all planes, and full range of motion of all fingers of

---

[8] The record includes *Attending Physician's Statements* signed by Dr. Kemple and bearing the following dates: May 25, 2000; October 5, 2000; December 7, 2000; March 8, 2001; July 2, 2001; October 17, 2001; February 11, 2002; and June 11, 2003.  [See PRLCL 00249, 00265, 00276, 00281, 00290, 00293, 00296, 00299, 00303; 00306, 00310, 00353].

both hands, the wrists and elbows, and the knees. Among other things, Ms. Elliott-Diskin was able to lean forward nearly fully with her fingertips about ten inches from the floor and rise from a partial squat on either leg. She had full strength in all muscle groups of the upper and lower extremities and appeared to have no swelling in her fingers, wrists, elbows, ankles, or knees. Ms. Elliott-Diskin did, however, complain of some tenderness and pain during palpation. She also would not shake Dr. Wellborn's hand upon greeting him because she said her arm was bothering her. During the subsequent examination, though, Dr. Wellborn noted that Ms. Elliott-Diskin demonstrated no difficulty moving or using her arm.

According to his written report, Ms. Elliott-Diskin told Dr. Wellborn that she loved her job in the audio-visual field. She described her job to him as one in which she shot footage, took photographs, and edited videotape. She told Dr. Wellborn that the heaviest thing she handled in her position was a ten-pound camera, but that she only used it twice a year. She also described her job as "not very physically demanding" and expressed that "her inability to work [was] primarily due to her fatigue as well as her inability to handle the cognitive requirements of her position." [PRLCL 00651].

In light of Ms. Elliott-Diskin's cognitive and memory complaints, Dr. Wellborn recommended she undergo a more detailed evaluation "by a competent and respected neuropsychologist." [PRLCL 00648]. Emphasizing that his examination had focused on her physical issues, Dr. Wellborn also recommended that additional tests (including an MRI) be conducted to assess Ms. Elliott-Diskin's bodily and cognitive complaints; he then reported that "[s]hould these diagnostic imaging tests be normal, [he] would find no barriers to Ms.

23

Diskin returning to work *from a physical standpoint . . . .*" [PRLCL 00648 (emphasis added)]. In conclusion, Dr. Wellborn stated that "it [was his] opinion based on the available medical information at the time of this IME, that Ms. Diskin could return to work to the position she described today *(from a physical standpoint)* if she wished to." [PRLCL 00648 (emphasis added)].

On January 14, 2004, in-house medical reviewer Tanya Horne, M.D. reached the same conclusion as Dr. Wellborn, having considered (1) Dr. Wellborn's IME; (2) Dr. Martin's April 4, 2000 report; (3) Ms. Rogers's *Vocational Rehabilitation Assessment of Work Capacity*; and (4) Dr. Brown's records.[9] [PRLCL 00464-00466]. Like Dr. Wellborn, Dr. Horne did not disagree with the diagnosis of fibromyalgia, but concluded on the basis of the medical evidence before her that there were no physical barriers to prevent Ms. Elliott-Diskin's return to work. Dr. Horne also recommended further cognitive testing. [ [PRLCL 00464-00466].

Finally, on August 30, 2004, Dr. Valencia Clay reviewed "[t]he entire file as presented." [PRLCL 00634]. Dr. Clay stressed that "[w]ith a reasonable degree of medical certainty, there is no evidence of total impairment except Mrs. Diskin's self-report[,]" and believed that, with appropriate treatment, Ms. Elliott-Diskin should be able to "return to normal function." [PRLCL 00633-00634].

Ms. Elliott-Diskin argues that the Court should accord more weight to the opinions

_____

[9] Dr. Horne's review included, but was not limited to, these documents and data. [See PRLCL 00466].

24

of her treating physicians than to the opinion of Dr. Wellborn, as they had a better understanding of her condition. [Doc. 22 at 16-17]. But Dr. Wellborn was not alone in his assessment. Instead, both Dr. Horne and Dr. Clay, after having reviewed Ms. Elliott-Diskin's file, agreed with Dr. Wellborn that, from a physical standpoint, Ms. Elliott-Diskin should eventually have been able to return to work. In Black & Decker Disability Plan v. Nord, the United States Supreme Court held that ERISA plan administrators are not obliged to accord special deference to the opinions of treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Acknowledging this rule, Ms. Elliott-Diskin nevertheless submits that her situation is one in which her established patient-doctor relationships with Drs. Brown, Kemple, and Pacheco should control, since they, "as internists/rheumatologists[,] had a better understanding of [her] disease process than Dr. Wellborn."[10] [Doc. 22 at 17].

But Drs. Brown, Kemple, and Pacheco were not unanimous in their opinions. While Dr. Kemple completed a number of *Attending Physician's Statements* on which he answered "yes" to the question "Is patient totally disabled?", Dr. Brown was far more muted,

---

[10] Again, it is not disputed that Ms. Elliott-Diskin suffered from fibromyalgia. Dr. Wellborn accepted that diagnosis. After having performed his IME, however, he did not believe that fibromyalgia rendered Ms. Elliott-Diskin totally disabled. Ms. Elliott-Diskin's treating internists and rheumatologists may have had a full understanding of the disease of fibromyalgia, but Dr. Wellborn is a Certified Independent Medical Examiner who conducts disability evaluations as part of his practice. [See PRLCL 00641]. Determining whether Ms. Elliott-Diskin was *totally disabled*, not whether she *suffered from fibromyalgia*, was the purpose of having her seen by Dr. Wellborn. See Black & Decker Disability Plan, 538 U.S. at 832 ("the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, . . . *a specialist engaged by the plan has expertise the treating physician lacks*.") (emphasis added).

describing Ms. Elliott-Diskin as "significantly disabled *on and off* by her condition [and having] no specific work instructions other than she must not be forced to work at times when she is feeling her symptoms." [PRLCL 00531 (emphasis added)].   Dr. Pacheco described Ms. Elliott-Diskin as "unemployable" but also stated his belief that it would likely be "difficult for her to return to her pervious occupation *given the associated cognitive issues* that arise when people have significant fibromyalgia syndrome." [PRLCL 00671 (emphasis added)].   Given these conflicting opinions, it was not unreasonable under the circumstances for UNUM/Provident to rely on its medical examiners' opinions as to whether Ms. Elliott-Diskin was totally physically disabled.   See Black & Decker Disability Plan, 538 U.S. at 825.

Having concluded that Ms. Elliott-Diskin was not totally impaired because she (1) could fully move, among other things, her neck, shoulders, hips, and fingers; (2) was able lean forward nearly fully with her fingertips within approximately one foot of the floor and rise from a partial squat on either leg; (3) had full strength in all muscle groups of the upper and lower extremities; and (4) appeared to have no swelling in her fingers, wrists, elbows, ankles, or knees; and (5) had been employed in a position with physical demands in the sedentary to light work category, however, could only have partly resolved the issue of whether she was "totally disabled."   This is because Ms. Elliott-Diskin's chief complaint was "the bed ridding chronic fatigue, short term memory loss and brain fog that disable[d her] from working, even on a part-time basis[,]" [PRLCL 00481], the cause of which she insisted was physical, not psychological.   Indeed, in her March 23, 2004 letter of appeal, Ms. Elliott-Diskin urged UNUM/Provident to consider the possibility that her cognitive complaints were

not psychological but, rather, "generated from [her c]entral [n]ervous [s]ystem. [PRLCL 00481]. But UNUM/Provident's decision not to order further psychological or diagnostic evaluations with respect to Ms. Elliott-Diskin's cognitive complaints, which was based on its determination that Ms. Elliott-Diskin had already exhausted the benefits to which she was entitled under the "Other Limitations" provision of her policy, foreclosed the possibility that a competent neuropsychologist or other evaluator might have found that her cognitive issues stemmed from the *physical* toll that fibromyalgia had taken, in which case benefits might not have been restricted to the "Other Limitations" provision. Even Dr. Wellborn, with whom Dr. Horne was in accord, issued a *qualified* determination of disability, stressing that his IME focused on the physical aspects of Ms. Elliott-Diskin's complaints and that a more detailed evaluation by a neuropsychologist, including an MRI scan of the brain and cervical spine, would be appropriate. In Dr. Wellborn's words, "*[s]hould [such] diagnostic imaging tests be normal*, [he] would find no barriers to Ms. Diskin returning to work from a physical standpoint, other than her willingness to do so." [PRLCL 00648 (emphasis added)].

In its April 6, 2004, letter to Ms. Elliott-Diskin, UNUM/Provident emphasized that (1) it "could not longer continue benefits, because the information in [Ms. Elliott-Diskin's] file did not continue to provide clinical support of restrictions and limitations that would prevent [her] from performing the important duties of [her] occupation[;]" (2) Ms. Elliott-Diskin had to date "provided [her] own understanding of [her] medical condition(s) and the impact it ha[d] on [her] functionality [but] did not submit any additional medical records in support of [her] claim[;]" and (3) if she had "additional medical information that [was] based

on clinical findings" she should submit it to the claim handler's attention. [PRLCL 00488-00489 (emphasis added)].  Similarly, in its FAD of October 22, 2004, UNUM/Provident explained that "clinically supported restrictions and limitations [could] not be established from the medical data that had been made available to" it. [PRLCL 00686].

It is true that the "[d]enial of benefits is permissible when the allegedly disabling condition has been established only by the claimant's subjective complaints, and the claimant has failed to supply requested information that would allow the administrator to determine the ongoing effect of the condition."  Meraou v. Williams Co. Long Term Disability Plan, 221 Fed.Appx. 696, 705 (10th Cir. 2007) (citing Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 877) (9th Cir.2004)).  But in this case, it was UNUM/Provident's own medical professionals, Drs. Wellborn and Horne, who recommended further cognitive testing, the results of which might have assisted in the determination whether Ms. Elliott-Diskin's complained-of cognitive impairments were the result of something psychological or, as she believed, something physical.  To be sure, in its initial January 20, 2004 denial of Ms. Elliot-Diskin's claim, UNUM/Provident specifically noted Dr. Wellborn's recommendation that Ms. Elliott-Diskin's cognitive complaints "be evaluated by a competent and respected neuropsychologist[,]" as well as its medical reviewer's determination that Ms. Elliott-Diskin's "cognitive issues needed to be addressed." [PRLCL 00470]. UNUM/Provident, however, disregarded these recommendations, having unilaterally determined that any benefits due as a result of neuropsychological/cognitive impairments would necessarily have come under the "Other Limitations" ("Mental and Nervous")

provision of Ms. Elliott-Diskin's policy, maximum benefits under which had already been paid Ms. Elliott-Diskin.  The additional information UNUM/Provident needed to make a reasoned decision (*i.e.*, results of psychological examinations or diagnostic tests confirming or dispelling the root of Ms. Elliott-Diskin's claimed cognitive issues as psychological or physical) would have been available to it had it ordered the further testing suggested by its medical examiners.  Under the circumstances, this Court concludes that UNUM/Provident's decision not to order such testing rendered the IME incomplete, thereby resulting in an arbitrary and capricious decision by UNUM/Provident to deny long-term disability payments based on Ms. Elliott-Diskin's claimed physical condition.  See Filipowicz v. Am. Stores Ben. Plans Comm., 56 F.3d 807, 813 (7th Cir. 1995) (noting that ERISA decision-maker's reasoning is arbitrary or capricious when it entirely fail[s] to consider an important aspect of the problem [or] *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision* offer[s] an explanation for its decision that runs counter to the evidence . . . .").

### C. *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision*

On June 1, 2007, Administrative Law Judge Mark. R. Dawson issued a *Notice of Decision* on Ms. Elliott-Diskin's application for Social Security benefits that was fully favorable to her and in which he found her to be disabled for purposes of the Social Security Act. [Doc. 31; Appx. 1, "June 1, 2007 *Notice of Decision - Fully Favorable*"].  On June 27, 2007, Ms. Elliott-Diskin moved to supplement the Administrative Record in this case with

ALJ Dawson's *Notice of Decision*, or to remand the matter to allow UNUM/Provident to reconsider its denial of benefits in light of the *Notice of Decision*. [Doc. 27]. UNUM/Provident opposes this request on various grounds. [See generally Doc. 32].

In light of the Court's directive in this case that the matter be remanded for further consideration, Ms. Elliott-Diskin's *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision* will be denied. However, in so ruling, this Court does not prohibit Ms. Elliott-Diskin from asking UNUM/Provident to consider the Social Security decision in its reevaluation of her claim for long-term disability benefits.

**III. CONCLUSION**

For the reasons set forth more fully above, the Court concludes that, given the particular facts and circumstances of this case, UNUM/Provident acted arbitrarily and capriciously in denying Ms. Elliott-Diskin's claim for long-term benefits without first having her cognitive complaints evaluated by a competent neuropsychologist, as was recommended by, among others, its Independent Medical Examiner and its in-house medical reviewer. Accordingly, the Court will remand the matter to UNUM/Provident with instructions to arrange for Ms. Elliott-Diskin to undergo, at UNUM/Provident's expense, the additional neuropsychological and diagnostic testing recommended by Dr. Wellborn. In light of this limited remand, the Court defers consideration of the merits of UNUM/Provident's decision.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Judgment on Administrative (ERISA) Record* [Doc. 18], is **DENIED**;

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to Reverse ERISA Benefits Denial* [Doc. 21], is **DENIED**;

**IT IS FURTHER ORDERED** that this matter is **REMANDED** to UNUM/Provident for the limited purposes of arranging for Ms. Elliott-Diskin to undergo and complete, at UNUM/Provident's expense, the additional neuropsychological/cognitive evaluation and testing recommended by J. William Wellborn. M.D. in his Independent Medical Evaluation of September 11, 2003;

**IT IS FURTHER ORDERED** that upon completion of such evaluation and testing, UNUM/Provident shall reevaluate Ms. Elliott-Diskin's claim for long-term disability benefits based on her claimed physical disability, through a process of administrative review, and in consideration of the plan;

**IT IS FURTHER ORDERED** that the *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision* [Doc. 27], is **DENIED**.

**IT IS FURTHER ORDERED** that this Court's denial of the *Motion to Supplement Record on Appeal or Remand Case to Defendant for Re-Consideration of LTD Benefits Due to Favorable Social Secutity* [sic] *Decision* [Doc. 27] shall not prohibit Ms. Elliott-Diskin from asking UNUM/Provident to consider the Social Security decision in its reevaluation of her claim for long-term disability benefits.

**SO ORDERED** this 28th day of September, 2007, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge